ALEC JOHNSON (Cal. Bar No. 270960)
Email: johnsonstu@sec.gov
MATTHEW T. MONTGOMERY (Cal. Bar No. 260149)
Email: montgomerym@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Katharine E. Zoladz, Regional Director
Brent Wilner, Associate Regional Director
Douglas M. Miller, Regional Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                    Plaintiff,<br><br>        vs.<br><br>JAMES BURLESON,<br><br>                    Defendant. | Case No.<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Securities and Exchange Commission ("SEC") alleges:

## **SUMMARY**

1.     From August 2020 to October 2022 (the "Relevant Period"), Defendant James Burleson, the majority owner and principal of formerly SEC-registered investment adviser, Burleson & Company LLC (the "Firm"), conducted a fraudulent "cherry-picking" scheme to benefit himself at the expense of his clients, violating his fiduciary duty to act for his clients' benefit.

2.     Burleson conducted this fraud by making risky options trades in his Firm's block account, which allowed him to execute trades for multiple clients and then

subsequently allocate them to individual client accounts. Burleson then waited, frequently until after the markets had closed, to see whether his options trades would be profitable before deciding whether to allocate the trades to himself or to his clients.

3. During the Relevant Period, Burleson disproportionately allocated profitable options trades to his personal account, making over $1.8 million in profits with a return rate of +26.5 percent at the time of allocation. Meanwhile, Burleson disproportionately allocated unprofitable options trades to his clients' accounts, leaving them with over $3.2 million in losses with a return rate of -5.1 percent at the time of allocation.

4. The probability that such wildly divergent returns occurred by chance is less than one in a million.

5. In addition to this fraudulent conduct, Burleson also made materially false and misleading statements to his clients in the Firm's Form ADV, Part 2A filings, which claimed the Firm would allocate trades "in the most equitable manner possible." In light of Burleson's cherry-picking scheme, that claim was false.

6. Through his cherry-picking scheme and misrepresentations, Burleson violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder, Section 17(a) of the Securities Act of 1933 ("Securities Act"), and Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 ("Advisers Act").

7. With this action, the SEC seeks permanent injunctive relief against Burleson to prevent his future violation of the securities laws, disgorgement of his ill-gotten gains, and to punish his violations of the securities laws.

## JURISDICTION AND VENUE

8. The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a), Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27(a) of the Exchange Act, 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa(a), and Sections 209(d), 209(e)(1) and 214 of

the Advisers Act, 15 U.S.C. §§ 80b-9(d), 80b-9(3)(1) & 90b-14.

9.    Defendant, directly or indirectly, has made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices, and courses of business alleged in this Complaint.

10.    Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a), and Section 214 of the Advisers Act, 15 U.S.C. § 80b-14, because certain of the transactions, acts, practices, and courses of conduct constituting violations of the federal securities laws occurred within this district.  In addition, venue is proper because Burleson resides in this district and his Firm was based in this district.

## THE DEFENDANT

11.    James David Burleson, age 57, is a resident of Petaluma, California. Burleson previously held Series 7 and 66 licenses.

## THE ALLEGATIONS

**A.    Background on Burleson & Company**

12.    Burleson founded Burleson & Company, LLC, which was registered with the SEC as an investment adviser from March 30, 2006, through May 31, 2023.

13.    During the Relevant Period, Burleson owned 97 percent of the Firm and served as its principal, managing partner, and chief compliance officer.

14.    During the Relevant Period, both Burleson and his Firm were investment advisers, as defined by Section 202(a)(1) of the Advisers Act.

15.    During the Relevant Period, Burleson and his Firm provided investment advice to clients in exchange for advisory fees based on a percentage of assets under management.

16.    During the Relevant Period, Burleson's firm worked with over 200 clients.

17.    As of March 29, 2023, the Firm held over $450 million in regulatory

3

assets under management.

18.    During the Relevant Period, the Firm maintained brokerage accounts for all its clients at Charles Schwab & Co., Inc. ("Schwab"), including a personal account for Burleson.

19.    During the Relevant Period, the Firm also maintained a block or omnibus trading account at Schwab through which it could make trades on behalf of multiple clients simultaneously and allocate those trades to individual accounts afterwards, without identifying to Schwab in advance of the trade the specific accounts for which the trade was intended.

20.    For many of his clients, Burleson had been granted discretion to execute trades on the client's behalf without pre-authorization.

21.    As an investment adviser, Burleson owed a fiduciary duty to his advisory clients to act for his clients' benefit, including an affirmative duty of utmost good faith and full disclosure of all material facts.  Burleson also owed a duty to avoid misleading his advisory clients.

22.    On or about May 9, 2023, after the Relevant Period, the Firm sold its assets to another investment adviser.

**B.    Burleson's Cherry-Picking Scheme**

23.    Burleson's cherry-picking scheme involved options trading through the Firm's block trading account at Schwab.

24.    Burleson was the only person at his Firm who traded options through the block account.

25.    In making his options trades, Burleson could place the trade either as a "direct trade" or an "allocated trade."

26.    A direct trade was one in which Burleson placed the option purchase or sale in the individual client account or his own personal account.

27.    An allocated trade was one in which Burleson placed the option purchase or sale in the Firm's block trading account and later allocated the options to

individual client accounts or his own personal account.

28.    Burleson was the sole person at his Firm in charge of directing allocations of options trades from the block account to individual client accounts.

29.    As part of his cherry-picking scheme, Burleson placed options trades in the Firm's block account and subsequently allocated the trades to individual client accounts or his own personal account.

30.    During the Relevant Period, Burleson executed over 750 options trades through the Firm's block account.

31.    Burleson's options trades during the Relevant Period were then allocated to 32 different individual accounts at Schwab, including Burleson's own account and two accounts held in the names of his children.

32.    Burleson breached his fiduciary duty to the 29 clients ("Defrauded Clients") to whom he allocated options trades by engaging in his cherry-picking scheme, which unfairly benefitted Burleson at the Defrauded Clients' expense.

33.    Burleson managed each of the Defrauded Client accounts on a discretionary basis.

34.    Burleson executed his cherry-picking scheme by trading in options in the Firm's block account and delaying the allocation of these trades to a specific account until after he had an opportunity to observe the options' intraday performance.

35.    If the option price went up between the time of the trade and the later allocation, Burleson disproportionately allocated the trade to his personal account.  If, however, the option price went down between the time of the trade and the later allocation, Burleson disproportionately allocated the trade to the Defrauded Clients' accounts.

36.    Burleson did not make a contemporaneous record of how he intended to allocate options trades in advance of or at the time of the trades.

37.    During the Relevant Period, Burleson executed more than 60 percent of the options trades in the Firm's block account before noon eastern time.

38.    During the Relevant Period, Burleson waited until after the markets closed to allocate over 87 percent of the options trades he executed in the block account.

39.    As reflected in the chart below, during the Relevant Period, Burleson disproportionately allocated profitable options trades to his personal account, earning over $1.8 million profit with a return rate of +26.5 percent at the time of allocation. During the same period, Burleson disproportionately allocated unprofitable options trades to his Defrauded Clients' accounts, leaving them with over $3.2 million in losses, with a return rate of -5.1 percent at the time of allocation.

| Accounts | Total Profits/Losses at Time of Allocation | Total Return Rate at Time of Allocation |
|---|---|---|
| Burleson | $1,862,160 | +26.5% |
| Defrauded Clients | -$3,260,260 | -5.1% |

40.    By contrast, as reflected in the table below, when Burleson traded options directly in his personal account as opposed to in the block account—leaving him no opportunity to cherry-pick the profitable trades—the profitability of his returns plummeted to -5.8 percent, as measured at the end of the first day.

| Accounts | Return Rate for Allocated Trades | First-Day Return Rate for Direct Trades |
|---|---|---|
| Burleson | +26.5% | -5.8% |
| Defrauded Clients | -5.1% | -3.9% |

41.    During the Relevant Period, Burleson allocated over 90 percent of his options trades to just five accounts: his own personal account and four accounts held by clients with over $1 million in assets.

42.    These high value accounts had significant additional activity to mask the losses allocated to them through Burleson's options trades.

43.    The wide difference in the profitability of Burleson's options trades was

due in part to the fact that he frequently traded options that were expiring within three days of the date of purchase or sale.  These options trades were particularly risky, offering a higher potential profit but also a higher potential loss.

44.     In fact, 80 percent of Burleson's total profits from options trades—over $1.4 million as measured at the time of allocation—came from options set to expire within three days or less.

45.     Further, Burleson frequently used his Firm's block account to complete options transactions within a single day by either: (1) acquiring options and then closing the position within the same day; or (2) acquiring options that expired the same day, locking in the price.

46.     These same-day options trades allowed Burleson to know exactly how profitable they would be before he allocated them at the close of the trading day.

47.     In fact, more than $1 million of Burleson's profits from options trades during the Relevant Period (over 56 percent) were from these same-day trades.

48.     On these same-day options trades, Burleson allocated to himself trades with a return rate of over +75 percent.

49.     In contrast, the same-day options trades that Burleson allocated to his clients during the Relevant Period had a return rate of -15.8 percent.

50.     The probability that the wildly divergent allocation of returns between Burleson's personal account and his Defrauded Client's accounts occurred by chance—as opposed to knowing and intentional conduct—is less than one in a million.

51.     This scheme was inherently deceptive because cherry-picking is virtually impossible for clients to detect on their own.  Clients are usually unable to see how their adviser allocates trades and rely on their adviser to meet his fiduciary duty to act in their best interest and put their financial interests ahead of his own. Thus, each time Burleson allocated a trade based on a security's performance was an inherently deceptive act in furtherance of the scheme.

**C.    Schwab Notifies Burleson and Ultimately Terminates His Account**

52.    Around March 1, 2021, Schwab identified possible cherry-picking by Burleson based on his allocations of trades.

53.    On March 23, 2021, Schwab representatives called Burleson and explained that Schwab had identified potential preferential options allocations to Burleson's personal account.

54.    Schwab representatives advised Burleson that a securities' performance should not determine its allocation and suggested that Burleson speak to his Firm's compliance consultant or to the SEC for more guidance.

55.    Burleson told Schwab that he allocated trades to his personal account from the block account because the block account was easier to use, but that it would be "no big deal" to trade directly in his personal account going forward.

56.    However, Burleson continued to trade options through his Firm's block account after this call with Schwab.

57.    And Burleson continued to disproportionately allocate profitable options trades to his personal account after the call from Schwab.

58.    Burleson attempted to mask his cherry-picking by including a few clients' accounts when allocating profitable options trades to himself.

59.    Indeed, in the eight months prior to the call with Schwab in March 2021, Burleson allocated 27 options trades solely to his own account.  But over the 19 months following that call, Burleson did not allocate any options trades solely to his own account.

60.    On October 26, 2022, Schwab representatives called Burleson again and raised concerns about additional trading that was indicative of a preferential block allocation scheme.

61.    During that call, Burleson stated that he knew ahead of time who would be allocated the trades but that, going forward, he intended to allocate the opening trade upon execution, rather than at the end of the day.

62.    In late November 2022, Schwab representatives notified the Firm that it was terminating Schwab's relationship with the Firm due to Schwab's concerns over Burleson's preferential allocations.

63.    Schwab subsequently terminated the Firm's access to its block trading system on December 2, 2022.

64.    Burleson did not use the block account to allocate options after the October 26, 2022, call from Schwab.

**D.    Burleson's False and Misleading Statements to His Clients**

65.    A Form ADV is a document filed with the SEC by investment advisers. The filing consists of two parts: Part 1 contains general information about the firm; and Part 2 is a narrative description of key information about the firm, including the types of services the firm provides.  An investment adviser's Form ADV must be updated annually and be made available to firm clients.

66.    Burleson's Firm filed both parts of its Form ADV in 2020, 2021, and 2022.

67.    Burleson signed the Firm's Form ADV in each of these years.

68.    Burleson also approved the contents of the Firm's Form ADV Part 2.

69.    The Firm's Form ADV Part 2 was provided to all of the Firm's clients.

70.    During the Relevant Period, each version of the Firm's Form ADV Part 2 stated: "As a fiduciary, it is our duty to always act in the client's best interest."

71.    Further, each version of the Firm's Form ADV Part 2 contained a section entitled "Trade Aggregation and Allocation" that stated the Firm would "attempt to allocate trade executions in the most equitable manner possible, taking into consideration client objectives, current asset allocation and availability of funds using price averaging, proration and consistently non-arbitrary methods of allocations."

72.    These statements from the Firm's Form ADV Part 2 were false and misleading considering Burleson's cherry-picking scheme.

73.    Specifically, the statement that Burleson and the Firm would "always act

9

in the client's best interest" was false.

74.   Further, the statement that Burleson and the Firm would "attempt to allocate trade executions in the most equitable manner possible" was false.

75.   These statements were material to investors in deciding to use and continue to use Burleson and his Firm as their investment advisers, meaning Burleson's advisory clients would have considered it important to know that the following statements contained in the Firm's Form ADV's were false: (a) that Burleson and the Firm would always act in their clients' best interest, and (b) that Burleson and the Firm would allocate trades in the most equitable manner.

**E.    Burleson's Scienter and Negligence**

76.   Burleson knew, or was reckless in not knowing, that using the block account to allocate profitable trades to his personal accounts and unprofitable trades to his clients violated the fiduciary duty that he owed to them.  At a minimum, Burleson acted negligently and unreasonably when allocating his options trades for the benefit of his own account and to the detriment of his Defrauded Clients' accounts.

77.   Burleson's scienter and negligence in carrying out the scheme is evidenced by the following:

(a)   Burleson was the only person at his Firm who traded options through the block account and the sole person in charge of directing the allocation of those trades.

(b)   Burleson did not memorialize how he intended to allocate options trades from the block account in advance of or at the time the trades were made.

(c)   Burleson executed most of his options trades from the block account before noon eastern time but waited to allocate most of his options trades until after the market closed.

(d)   Burleson disproportionately allocated profitable options trades from the block account to his own account and disproportionately allocated

10

1    unprofitable options trades to the Defrauded Clients' accounts.

2          (e)    At the time of allocation, the difference in profitability between

3    the options trades that Burleson allocated to himself versus the options trades that he

4    allocated to his Defrauded Clients was so significant (+26.5% return rate to Burleson

5    vs. a -5.1% return rate to his Defrauded Clients) that the probability of this occurring

6    by chance—as opposed to knowing and intentional conduct—is less than one in a

7    million.

8          (f)    When Burleson traded options directly in his own account, his

9    first-day return rate was -5.8 percent—more than 32 percentage points worse than the

10    return rate of options trades that Burleson allocated to himself from the block

11    account.

12          (g)    Schwab representatives told Burleson in March 2021 that they had

13    identified preferential allocations of options trades made in the block account, but

14    Burleson continued to make options trades in the block account—without identifying

15    which client they were made for—and continued to wait to allocate those trades until

16    after the market closed.

17          (h)    Burleson's only change after this call from Schwab was to attempt

18    to mask his disproportionate allocations of profitable options trades by including a

19    few client accounts when allocating these trades to his own account.

20        78.    Burleson also knew, or was reckless or negligent in not knowing, that his

21    Firm's Forms ADV were false and misleading when they claimed that the trading of

22    securities would be allocated fairly and equitably among client accounts.

23        79.    Burleson's scienter and negligence in signing the false and misleading

24    Form ADV is evidenced by the same evidence outlined above in paragraph 77.

25                     **FIRST CLAIM FOR RELIEF**

26        **Fraud in Connection with the Purchase or Sale of Securities**

27        **Violations of Section 10(b) of the Exchange Act and Rule 10b-5**

28        80.    The Commission realleges and incorporates by reference here the

allegations in paragraphs 1 through 79.

81.    As alleged above, Burleson engaged in a scheme defraud, made materially false statements, and engaged in acts, practices or courses of business that operated as a fraud upon his clients, in connection with the purchase and sale of securities, by cherry-picking favorable options trades for his own account and by allocating less favorable options trades to his Defrauded Clients' accounts.

82.    By engaging in the conduct described above, Burleson, directly or indirectly, in connection with the purchase or sale of a security, and by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact and omitted to state material facts in order to make the statements made, in light of the circumstances under which they were made, not misleading, and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

83.    By engaging in the conduct described above, Burleson violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. §§ 240.10b-5(a)-(c).

## SECOND CLAIM FOR RELIEF

### Fraud in the Offer or Sale of Securities
### Violations of Sections 17(a) of the Securities Act

84.    The Commission realleges and incorporates by reference here the allegations in paragraphs 1 through 83.

85.    As alleged above, Burleson engaged in a scheme to defraud clients, obtained money by means of untrue statements, and engaged in a course of business that operated as a fraud upon a purchaser, by cherry-picking favorable options trades for his own account and allocating less favorable options trades to the Defrauded Clients' accounts.

86.    By engaging in the conduct described above, Burleson, directly or

indirectly, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails directly or indirectly employed devices, schemes, or artifices to defraud, obtained money by means of untrue statements of material fact or omissions to state a material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and engaged in transactions, practices, and courses of business which operated as a fraud or deceit upon on a purchaser.

87.    By engaging in the conduct described above Burleson violated Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

## THIRD CLAIM FOR RELIEF

### Fraud by an Investment Adviser
### Violations of Sections 206(1) and 206(2) of the Advisers Act)

88.    The Commission realleges and incorporates by reference here the allegations in paragraphs 1 through 87.

89.    As alleged above, Burleson had an adviser-client relationship with, and therefore owed a fiduciary duty to, each of his Firm's clients.

90.    Burleson breached his fiduciary duty by carrying out the cherry-picking scheme and by falsely representing in his Firm's Form ADV Part 2 that the Firm would act in its clients' best interest and equitably and fairly allocate transactions among its clients.

91.    By engaging in the conduct described above, Burleson, directly or indirectly, by use of the mails or means of instrumentalities of interstate commerce: (a) with scienter, employed devices, schemes or artifices to defraud clients or prospective clients, and (b) with scienter or, at a minimum negligently, engaged in transactions, practices, or courses of business which operated as a fraud or deceit upon clients or prospective clients.

92.    By engaging in the conduct described above, Burleson violated Sections 206(1) and (2) of the Advisers Act, 15 U.S.C. §§ 80b-6(1) & 80b-6(2).

# PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court:

## I.

Issue findings of fact and conclusions of law that Burleson committed the alleged violations.

## II.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Burleson from violating Section 17(a) of the Securities Act [15 U.S.C. §77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§80b-6(1) & 80b-6(2)].

## III.

Order Burleson to disgorge all funds received from his illegal conduct, together with prejudgment interest thereon pursuant to Securities Exchange Act of 1934, Section 21(d)(3), (d)(5) and (d)(7) [15 U.S.C. §§ 78u(d)(3), (d)(5) and (d)(7)].

## IV.

Order Burleson to pay civil penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)].

## V.

Issue an order against Burleson, in accordance with Securities Act Section 20(b), and Exchange Act Sections 21(d)(1) and 21(d)(5), permanently restraining and enjoining Burleson from participating, directly or indirectly, in the purchase, offer, or sale of any security other than for his own personal accounts.

## VI.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of

all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

### VII.

Grant such other and further relief as this Court may determine to be just and necessary.

Dated:  November 21, 2024

_/s/ Alec Johnson_

Alec Johnson
Matthew T. Montgomery
Attorneys for Plaintiff
Securities and Exchange Commission